**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------x
DANA GROTTANO;
N.D.; A.R.; and D.M.,
*individually and on behalf of all*
*others similarly situated,*

                            Plaintiffs,

            -against-                                **15 Civ. 9242 (RMB)(KNF)**

THE CITY OF NEW YORK;                                **JURY TRIAL DEMANDED**
THE CITY OF NEW YORK
DEPARTMENT OF
CORRECTION COMMISSIONER
JOSEPH PONTE;
CORRECTION OFFICER
YOLANDA CAPERS;
CORRECTION OFFICER "JANE"
MAYWEATHER; CORRECTION OFFICER
"JANE" GRAHAM; and JOHN AND JANE DOE
CORRECTION OFFICERS 1-25,

                            Defendants.
------------------------------------------------------x

## SECOND AMENDED CLASS ACTION COMPLAINT

Named Plaintiffs DANA GROTTANO, N.D., A.R., and D.M. (collectively,

"Plaintiffs" or "named Plaitniffs"), and the putative class that they represent, by and

through their undersigned counsel, Giskan Solotaroff & Anderson LLP and Beranbaum

Menken LLP, allege as follows upon information and belief as against Defendants the

City of New York ("City"), the City of New York Department of Correction ("DOC")

Commissioner Joseph Ponte, DOC Correction Officer ("CO") Yolanda Capers, CO

"Jane" Mayweather, CO "Jane" Graham, and John and Jane Doe Correction Officers 1-

25 (collectively, "Defendants").

## INTRODUCTION

1.      The City of New York is illegally strip searching visitors to City jails.

2.      The United States Constitution requires that, to justify the strip search of a particular visitor, prison officials must point to specific, objective facts and rational inferences that establish particularized reasonable suspicion directed specifically to that visitor.  The standard for body cavity searches is even higher.  That is because courts have long recognized that such visitor searches are, at the very least, extremely embarrassing and unpleasant, and, at worst, dehumanizing and repulsive.  Therefore, by randomly strip searching visitors to its jails, the City is routinely breaking the law.

3.      In Plaintiff Grottano's case, on September 1, 2015, during what should have been a routine security pat-frisk, Plaintiff Grottano was strip and/or body cavity searched by Defendant Capers on Rikers Island, right in front of her five year old daughter.  Plaintiff Grottano was on Rikers Island that morning to visit an inmate.  Although Plaintiff Grottano walked through a metal detector and was inspected by a K-9 police dog without incident, Defendant Capers accompanied Plaintiff Grottano and Plaintiff Grottano's five year old daughter behind a privacy curtain where, without any reasonable suspicion whatsoever and in brazen violation of the law, she ordered Plaintiff Grottano to pull down her pants and placed her hand directly on Plaintiff Grottano's vagina.  Defendant Capers then ordered Plaintiff Grottano to lift her shirt and pull her brassiere away and expose her breasts.  Defendant Capers asked Plaintiff Grottano why she looked nervous. When Plaintiff Grottano responded that she was "nervous because I've never been through this before," Defendant Capers told her that "this is proper procedure."

4.      Plaintiffs A.R., N.D., and D.M. were also illegally strip searched while visiting inmates at City jails.  On October 2, 2015, Plaintiff A.R. was strip searched by an unidentified CO at Rikers Island while Defendant Mayweather observed, although there was no particularized reasonable suspicion and/or probable cause to do so.  Plaintiff N.D. was strip searched by an unidentified CO at Rikers Island in October, 2014, while visiting an inmate, although, here too, there was no particularized reasonable suspicion and/or probable cause to strip search Plaintiff N.D.  Plaintiff N.D. was also strip searched by another unidentified CO at the Brooklyn House of Detention in July, 2015, and November, 2015.  Plaintiff D.M. was strip searched by Defendant Graham at the Brooklyn House of Detention in December, 2015.

5.      The City has long been on actual and/or constructive notice about the problem of strip and/or body cavity searching visitors to DOC facilities.

6.      The New York City Board of Correction ("BOC")[1] has received numerous complaints from visitors about illegal searches in the past three years.

7.      In July, 2015, pro se plaintiff Nimra Butt sued Defendant Capers in the Southern District of New York, alleging that Defendant Capers ordered her to enter a private area and remove her clothing and expose her breasts and genitalia without cause.[2]

8.      Plaintiff Grottano also filed a complaint with the City about her illegal search by calling 311 on September 3, 2015.  Plaintiff Grottano's counsel also sent a letter to the

_____

[1]      The BOC monitors conditions in the City's jails, including recording and reviewing visitor grievances.

[2]      See Pro Se Complaint in Nimra Butt v. Officer Capers, et al., 15 Civ. 5758 (S.D.N.Y.).

DOC on September 15, 2015, notifying the DOC that Plaintiff Grottano was illegally searched by Defendant Capers.

9.      There are also several recent media reports about visitor strip searches,[3] which indicate that four other women filed notices of claim against the City because they were illegally strip and/or body cavity searched while visiting a DOC facility.[4]

10.     The undersigned has also spoken with numerous other individuals who have described having to submit to random strip and/or body cavity searches while visiting inmates at jails around the City.

11.     These actions constitute an egregious breach of DOC rules and regulations, which impose rigorous requirements upon correction officers who wish to physically search a visitor. The DOC's Inmate Visit Procedures Directive ("Directive") regarding visitor searches is annexed hereto as Exhibit A. Section IV(B)(2) of the Directive states that each visitor shall be subject to an electronic search involving a walk-through metal detector. Section IV(C) establishes that, if a visitor has been checked with a metal detector and staff reasonably believe that further inspection is necessary to preclude the introduction of contraband (i.e., the triggering of the metal detector, a suspicious bulge in the visitor's clothing, confidential information, or the visitor's documented history of

---

[3]      See http://www.nbcnewyork.com/investigations/Strip-Search-Rikers-Island-New-York-Investigation-Police-Women-Correction-Officer-Wallace-362438221.html (accessed on Feb. 24, 2016); http://www.nbcnewyork.com/investigations/NYC-Wife-Says-She-Was-Strip-Searched-Visiting-Rikers-Prison-352413251.html (accessed on Feb. 24, 2016); http://nypost.com/2015/11/19/rikers-guards-stripped-me-naked-and-grabbed-my-giant-fake-breasts/ (accessed on Feb. 24, 2016).

[4]      The Comptroller's Office denied Plaintiffs' FOIL request for these notices of claim on the basis that their disclosure is barred under N.Y.S. Civil Rights Law § 50-b(1), which prohibits the disclosure of the identity of any victim of a sex offense for public inspection.

attempting to bring in contraband), the staff member shall immediately notify the area supervisor, who shall evaluate the situation to determine if further inspection for contraband is warranted. If the area supervisor determines that further inspection is warranted, he/she shall notify the Commanding Officer (or his/her designee) and, if given approval by the Commanding Officer, shall give the visitor a Search Consent Report form explaining the reason for a pat-frisk and the pat-frisk process.  The Directive establishes that the pat-frisk search should be conducted by patting the outer clothing over the entire length of the visitor's body.  The Directive makes it clear that the visitor's "skin shall be touched only at the shirt-sleeves and collar."  The Directive also requires that, in conducting a search, "officers shall strive to preserve the dignity of the visitor being searched."

12.     The Directive says nothing about strip searches.

13.     The City has long had a problem combatting contraband in DOC facilities.  But the problem does not lie with visitors: as BOC Member Robert L. Cohen, M.D. explained on October 13, 2015, "the data suggests that contraband is not coming in with families." Elizabeth Gaynes–the President and CEO of the Osborne Association—also testified to the BOC, on October 16, 2015, that "[t]here is no data connecting violence to visiting." Ms. Gaynes recommended that, instead of focusing on visitors, the City should focus resources on "those staff who are the source of much of the problem."

14.     Ms. Gaynes' recommendation reflects the inconvenient truth that the flow of contraband into DOC facilities is largely attributable to DOC employees and COs.

15.     In November, 2014, the New York City Department of Investigation ("DOI") issued a report on contraband smuggling in City jails ("2014 DOI Report") that

demonstrated that contraband smuggling by COs is widespread.[5]  The DOI spent hundreds of hours reviewing security videos, conducting site visits, and performing undercover integrity tests.  The DOI uncovered evidence that COs were conspiring with one another to smuggle contraband and that contraband smuggling by COs was widespread.  For instance, an undercover DOI investigator was able, on six of six occasions, to smuggle a razor blade and large quantities of heroin, marijuana, and prescription narcotics past all screening checkpoints at Rikers Island.[6]

16.     According to Jennifer Sculco—the DOI Senior Inspector General who drafted the 2014 DOI Report—the COs' distribution ring to inmates "was much larger than we had seen before and included different facilities."  Inspector General Sculco described that COs brought narcotics into Rikers and made deliveries to different inmates, who would then "sell narcotics or well whatever they got from the correction officers to other inmates."  Payments were made to COs for providing contraband, by cash or Western Union.  Inspector General Sculco concluded that contraband smuggling by COs is widespread and the City has failed to take measures that are adequate to prevent DOC staff from bringing drugs and other contraband into the jails.[7]

---

[5]     See New York City Department of Investigation Report on Security Failures at City Department of Correction Facilities, November, 2014 (available at https://assets.documentcloud.org/documents/1354724/d-o-i-report-on-security-failures-at-correction.pdf).

[6]     The investigator smuggled 250 glassine envelopes of heroin; 24 strips of suboxone; a half-pound of marijuana; and a 16-ounce bottle of vodka.

[7]     The 2014 DOI Report was made public because, in Inspector General Sculco's words, "[t]here are certain recommendations that really needed to be implemented . . . [and] the implementation of making this public was to really get buy in from the agency to make some serious changes . . . ."  In the face of the DOC's recalcitrance, Inspector General Sculco believed that publication was necessary to shame the DOC into rectifying

17.     The DOI made several recommendations to curb the introduction of contraband. In an August 26, 2015, deposition, Inspector General Sculco testified that her recommendations were not implemented because of "union pressure" from the Corrections Officers' Benevolent Association, headed by Norman Seabrook.  In a December 28, 2015, Daily News article, Mr. Seabrook was quoted as saying that "[t]he problem here is the DOI's focus on correction officers and not on inmate visitors.  DOI should do a better job of actually stopping contraband instead of persecuting innocent officers."

18.     Although the data demonstrate otherwise and the DOI found after extensive investigations that COs are largely responsible for smuggling and distributing contraband in DOC facilities, the City and Defendant Ponte followed Mr. Seabrook's lead and scapegoated visitors.  New York City Mayor Bill de Blasio and Defendant Ponte have had direct, personal involvement in developing and implementing what Mayor de Blasio has described as "a much stronger, much stricter visitor policy."

19.     Despite the evidence to the contrary and without proffering any supporting evidence of his own, on March 24, 2015, at a hearing before the New York City Council Committee on Fire and Criminal Justice Services, Defendant Ponte insisted that "the majority of the contraband coming into the jails is due to visits."  Chairperson Elizabeth S. Crowley pointed out that "the Department of Investigation had – they did an investigation and found that staff was bringing in contraband," but Defendant Ponte testified that the DOC would endeavor to keep weapons and drugs and other contraband out of their facilities by focusing on visitors.

---

the problem of staff smuggling drugs and deadly weapons into its jails.

20.     On March 12, 2015, while announcing the "14-Point Rikers Anti-Violence Agenda" that he developed in conjunction with Defendant Ponte, Mayor de Blasio—with Defendant Ponte and other top DOC officials at his side—insisted that "we know that the reality is that so many inmates acquire weapons and drugs through visitors." Mayor de Blasio discounted the problem of COs bringing contraband into the jails, which he said "pales in comparison to the challenge posed by the visitation dynamic." Mayor de Blasio boasted that he would "create a dynamic where it's quite clear that there are consequences and that those actions are going to be intercepted, which means, again, a lot of people will not even try in the first place." Mayor de Blasio announced that the City would implement "efforts to add some real limitations to the flow of weapons and drugs through the visitation process."

21.     There is a direct and proximate causal link between the City's efforts and/or inactions and Plaintiffs' illegal searches.

22.     Conducting strip and/or body cavity searches on persons, including the named Plaintiffs and those who are similarly situated, without particularized suspicion borne of the facts on an individual case, is humiliatingly invasive, degrading, unconstitutional, and flatly prohibited by settled law.

23.     Plaintiffs bring this civil rights class action pursuant to the United States Constitution, as amended, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the New York State Constitution. Plaintiffs seek redress for Defendants' deprivation, under color of state law, of Plaintiffs' and the class's rights, privileges, and immunities secured by the Constitution and laws of the United States and the State of New York.

24.     Plaintiffs and the class seek (1) declaratory judgment that a strip/body cavity search of a person visiting a DOC facility, absent particularized reasonable suspicion and/or probable cause to believe that that individual is secreting contraband, is unconstitutional; (2) an order enjoining Defendants from failing to adequately train, investigate, discipline, and/ or supervise subordinates, and/or enjoining Defendants from implementing or enforcing their policy, practice, and/or custom of conducting strip/body cavity searches in the absence of particularized reasonable suspicion and/or probable cause; (3) compensatory damages for the injuries caused by Defendants' unlawful conduct; and (4) punitive damages assessed to deter such intentional or reckless deviations from well-settled constitutional law.

## JURISDICTION and VENUE

25.     This action arises under the Fourth and Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the New York State Constitution.

26.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(4), 1367, and 2201.

27.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

28.     Plaintiff Dana Grottano is a resident of Queens, New York.  The inmate that Plaintiff Grottano was visiting at the time of the illegal search is currently incarcerated at a DOC facility.

29.     Plaintiff N.D. is a resident of The Bronx, New York.  The inmate that Plaintiff N.D. was visiting at the time of the illegal searches is currently incarcerated at a DOC

facility.  Plaintiff N.D. wishes to proceed anonymously and uses her initials to protect her privacy.  Plaintiff N.D. has made an application to the Court to proceed anonymously.

30.     Plaintiff A.R. is a resident of New York, New York.  The inmate that Plaintiff A.R. was visiting at the time of the illegal search has been transferred to a New York State prison.  Plaintiff A.R. wishes to proceed anonymously and uses her initials to protect her privacy.  Plaintiff A.R. has made an application to the Court to proceed anonymously.

31.     Plaintiff D.M. is a resident of Nassau County, New York.  The inmate that Plaintiff D.M. was visiting at the time of the illegal search is currently incarcerated at a DOC facility.  Plaintiff D.M. wishes to proceed anonymously and uses her initials to protect her privacy.

32.     Defendant City of New York is a municipality organized and existing under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through its DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all correctional matters and for the appointment, training, supervision, and conduct of all DOC personnel.  In addition, at all times material herein, Defendant City was responsible for ensuring that its personnel obeyed the Constitution and laws of the United States and the State of New York.

33.     Defendant Joseph Ponte is DOC Commissioner.  As DOC Commissioner, he is responsible for the development, implementation, and enforcement of all DOC practices and policies, and, as such, was at all times material herein a policy-maker with respect to the treatment of those visiting DOC facilities.  He was likewise responsible for the

training and supervision of DOC personnel, and the overall administration of DOC facilities.  Defendant Ponte is sued individually and in his official capacity.

34.     Correction Officer Yolanda Capers is and/or was at all relevant times an employee of the City of New York Department of Correction, working at Rikers Island in East Elmhurst, New York.  Defendant Capers' shield number is 15664.  Defendant Capers is sued individually and in her official capacity.

35.     Correction Officer "Jane" Mayweather is and/or was at all relevant times an employee of the City of New York Department of Correction, working at Rikers Island in East Elmhurst, New York.  Defendant Mayweather is sued individually and in her official capacity.  Defendant Mayweather's first name is currently unknown.

36.     Correction Officer "Jane" Graham is and/or was at all relevant times an employee of the City of New York Department of Correction, working at the Brooklyn House of Detention in Brooklyn, New York.  Defendant Graham is sued individually and in her official capacity.  Defendant Graham's first name is currently unknown.

37.     Defendants "JOHN and JANE DOE CORRECTION OFFICERS 1-25" were at all times material herein Correction Officers working at DOC facilities, who implemented, enforced, and effectuated the strip/cavity search policies and/or practices that are the subject of this action, acting in the capacity of agents, servants and employees of Defendant Ponte and Defendant City, and within the scope of their employment as such. Plaintiffs are unable to determine the names of these Defendants at this time, so they are sued under a fictitious designation.  JOHN and JANE DOE CORRECTION OFFICERS Nos. 1-25 are sued in their individual and official capacities.

## CLASS ALLEGATIONS

38.     Plaintiffs and the putative class seek a declaration that strip and/or body cavity

searches of persons visiting DOC facilities, absent particularized reasonable suspicion

and/or probable cause to believe that the visitor is secreting contraband, is

unconstitutional; a declaration that Defendants' failure to provide adequate training

and/or supervision to subordinates is unconstitutional; an order enjoining Defendants

from conducting such unconstitutional strip and/or body cavity searches; an order

enjoining Defendants to provide adequate training and/or supervision to subordinates;

compensatory damages for the injuries caused by Defendants' unconstitutional policy

and/or failure to train and/or supervise; and punitive damages.

39.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2), and 23(b)(3) on behalf of the following class:

> *All individuals since November 23, 2012, who were subjected to*
> *Defendants' policy, practice, and/or custom of strip and/or body cavity*
> *searching visitors to DOC facilities without particularized reasonable*
> *suspicion and/or probable cause to believe that the visitor was concealing*
> *contraband.*

40.     The class period commences on the date three years prior to the filing of the

original complaint (ECF Doc. No. 1), and extends to the date on which Defendants are

enjoined from, or otherwise cease, implementing or enforcing their unconstitutional

policy, practice, and/or custom of conducting strip and/or body cavity searches of visitors

to DOC facilities without particularized reasonable suspicion and/or probable cause.

41.     The members of the class are so numerous as to render joinder impracticable.

Upon information and belief, there are and continue to be hundreds of persons visiting

DOC facilities who are strip and/or body cavity searched without particularized

reasonable suspicion and/or probable cause, all of whom are members of the class, and all of whose federal and state constitutional rights have been or will be violated by Defendants' failure to adequately train, investigate, discipline, and/or supervise subordinates, and/or Defendants' policy, practice, and/or custom of routinely strip/body cavity searching persons who are visiting DOC facilities irrespective of whether particularized reasonable suspicion and/or probable cause exists.

42.     The questions of law and fact common to the class include whether the class members have common rights under the United States Constitution and New York State Constitution to be free from strip and/or body cavity searches, and that Defendants' conduct in routinely strip and/or body cavity searching class members without particularized reasonable suspicion and/or probable cause violated those rights.

43.     The named Plaintiffs are adequate representatives of the class.  The violations of law alleged by the named Plaintiffs stem from the same course of conduct by Defendants that violated and continue to violate the rights of members of the class.  Moreover, the legal theory under which the named Plaintiffs seek relief is the same or similar to that on which the class will rely.  Moreover, the harm suffered by the named Plaintiffs is typical of the harm suffered by the absent class members.  The named Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.

44.     The named Plaintiffs are represented by Giskan Solotaroff & Anderson LLP and Beranbaum Menken LLP.  Giskan Solotaroff and Beranbaum Menken specialize in civil rights cases and class actions.  Giskan Solotaroff and Beranbaum Menken have litigated a variety of actions against governmental entities and their employees, including strip

search class actions.  Giskan Solotaroff and Beranbaum Menken have the resources, expertise, and experience to prosecute this action.  Counsel for Plaintiffs know of no conflicts among members of the class or between the firms and members of the class.

45.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because (a) the prosecution of hundreds of separate actions would be inefficient and wasteful of legal resources; (b) the members of the class may be scattered throughout New York State and the tri-state area and are not likely to be able to vindicate and enforce their constitutional and statutory rights unless this action is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single class action than piecemeal in many separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against Defendants, which would establish incompatible standards of conduct for Defendants; (f) Defendants have acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate; and (g) questions of law and/or fact common to members of the class predominate over any questions that affect individual members.

## FACTS

46.     The United States Constitution and the New York State Constitution prohibit state officials from performing strip and/or cavity searches on visitors to jails and/or prisons without particularized reasonable suspicion and/or probable cause to believe that the visitor is concealing a weapon or other contraband.

47.     Defendants know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting strip and/or body cavity searches without particularized reasonable suspicion and/or probable cause.

48.     Reasonable suspicion and/or probable cause may only arise from the particular circumstances antecedent to a search.

49.     In clear defiance of constitutional requirements, Defendants have promulgated, implemented, enforced, and/or failed to rectify a policy, practice, and/or custom of strip and/or body cavity searching visitors to DOC facilities without any reasonable suspicion and/or probable cause, or indeed any suspicion of any sort.

50.     Estimating conservatively, hundreds of persons have been or will be unconstitutionally strip and/or body cavity searched with no particularized reasonable suspicion to justify the strip and/or body cavity search, pursuant to Defendants' policy, practice, and/or custom, and/or Defendants' failure to adequately train, investigate, discipline, and/or supervise, as described herein.

51.     As a direct and proximate result of the unlawful strip and/or body cavity searches conducted pursuant to Defendants' policy, practice, and/or custom, and/or Defendants' failure to adequately train, investigate, discipline, and/or supervise, as described herein, each victim of these unlawful strip and/or body cavity searches—each member of the class, including the named Plaintiffs—have suffered or will suffer psychological pain and mental anguish.

*Plaintiff Dana Grottano's Experience*

52.     Plaintiff Grottano's experience is representative of the experience of the putative class.

53.     On September 1, 2015, Plaintiff Grottano and her five year old daughter came to Rikers Island to visit an inmate.

54.     Plaintiff Grottano and her daughter entered Rikers Island at approximately 11:30 a.m. through the George Motchan Detention Center ("GMDC"), which is also known as the "3 Building."

55.     Plaintiff Grottano and her daughter walked, without incident, through a metal detector in the GMDC.  The metal detector did not indicate anything.

56.     Plaintiff Grottano and her daughter were also inspected by a K-9 police dog for contraband.  The K-9 did not indicate anything, either.

57.     Defendant Capers accompanied Plaintiff Grottano and her daughter behind a privacy curtain in the security area of the GMDC.

58.     Pursuant to Defendants' policy, practice, and/or custom, and/or failure to adequately train, investigate, discipline, and/or supervise, Plaintiff Grottano was strip and/or body cavity searched.

59.     Defendant Capers ordered that Plaintiff Grottano pull her pants down.

60.     Defendant Capers then placed her hand directly on Plaintiff Grottano's vagina.

61.     Defendant Capers did so without warning and without asking permission.

62.     Defendant Capers also did so in full view of Plaintiff Grottano's daughter.

63.     Defendant Capers then ordered Plaintiff Grottano to "open her legs wider," while she continued to handle Plaintiff Grottano's vagina.

64.     Defendant Capers noticed that Plaintiff Grottano was unsettled by the experience. Defendant Capers asked Plaintiff Grottano, "Why are you nervous?" Plaintiff Grottano responded, "I've never been through this before."  Defendant Capers told Plaintiff Grottano that "this is proper procedure."

65.     Defendant Capers then ordered Plaintiff Grottano to lift her shirt and pull up her brassiere, exposing Plaintiff Grottano's breasts.

66.     Defendant Capers did so in full view of Plaintiff Grottano's daughter.

67.     Defendant Capers then told Plaintiff Grottano to dress and return to the security waiting area.

68.     Plaintiff Grottano waited in the security waiting area for a few minutes before proceeding upstairs to the visiting room.

69.     On September 3, 2015, Plaintiff Grottano tried to file a formal complaint against Defendant Capers at the 100th Precinct.  However, the desk sergeant refused to accept Plaintiff Grottano's complaint.  So Plaintiff Grottano made a complaint to 311 about Defendant Capers' violative search. Plaintiff Grottano never heard back from anyone about her complaint.

70.     There was absolutely no reasonable suspicion and/or probable cause to believe that Plaintiff Grottano was concealing a weapon or other contraband.

71.     As a direct and proximate result of the unlawful strip and/or body cavity search conducted pursuant to Defendants' policy, practice, and/or custom, and/or failure to adequately train and/or supervise, Plaintiff Grottano has suffered and continues to suffer psychological pain and mental anguish.

*Plaintiff  N.D.'s Experience*

72.     Plaintiff N.D.'s experience is also representative of the putative class.

73.     In October, 2014, during a visit to a Rikers Island building known as the "parole building," Plaintiff N.D. went through a metal detector without incident.

74.     Nonetheless, a CO whose name Plaintiff N.D. does not know had her undergo a further search.  The CO had Plaintiff N.D. remove her sneakers, remove her socks, roll down her jeans to her knees, and turn around.  The CO also had Plaintiff N.D. unbutton her shirt and expose her breasts.

75.     Plaintiff N.D. was also forced to undergo multiple strip searches while visiting the Brooklyn House of Detention.

76.     During a visit in July, 2015, Plaintiff N.D. passed through two metal detectors without incident.  Nevertheless, an unidentified CO asked Plaintiff N.D. to pull her jeans down under her waist, bend forward, and pull out the band of her underwear, exposing her genitals.

77.     Plaintiff N.D. was required to undergo a similar search by the same CO on November 22, 2015.  The CO asked Plaintiff N.D. to roll down her jeans to her waist. The CO then pulled the band of Plaintiff N.D.'s underwear and looked down Plaintiff N.D.'s underwear at her genitals.

78.     There was never any reasonable suspicion and/or probable cause to believe that Plaintiff N.D. was concealing a weapon or other contraband.

79.     As a direct and proximate result of the unlawful search conducted pursuant to Defendants' policy, practice, and/or custom, and/or failure to adequately train and/or supervise, Plaintiff N.D. has suffered and continues to suffer psychological pain and

mental anguish.

*Plaintiff A.R.'s Experience*

80.    Plaintiff A.R.'s experience is also representative of the experience of the putative

class.

81.    On October 2, 2015, Plaintiff A.R. came to Rikers Island to visit an inmate.

82.    Plaintiff A.R. entered Rikers Island through a building known as "the control

center," where she waited on line to proceed through a first metal detector.  Plaintiff A.R.

proceeded through the first metal detector without incident.  The first metal detector did

not indicate anything.

83.    Plaintiff A.R. then sat and waited for a bus to take her to the GMDC building.

84.    Upon exiting the bus to the GMDC, Plaintiff A.R. walked through a second metal

detector, without incident.  The second metal detector did not indicate anything.

85.    Plaintiff A.R. then sat down in the GMDC waiting area.

86.    Plaintiff A.R. had visited the GMDC approximately 3 or 4 times prior.  On prior

occasions, before being allowed to proceed to the inmate visiting area, Plaintiff A.R. was

required to submit to another search, which included walking through a third metal

detector, removing her shoes, pulling up her pant legs to her calves, flipping out her

pockets, and pulling out her brassiere from over her shirt.  The guards that searched her

on those prior occasions never came close to Plaintiff A.R. during the searches and never

touched her.

87.    On October 2, 2015, a CO that Plaintiff A.R. had never encountered before came

out to the waiting area, called Plaintiff A.R.'s name, and directed Plaintiff A.R. to the

search area.

88.     The search area is separated from the waiting area by the third metal detector.

89.     Plaintiff A.R. walked closely behind the CO towards the search area and the third metal detector.

90.     Plaintiff A.R. walked through the third metal detector almost simultaneously with the CO, who was carrying metal objects.  The CO's metal objects triggered the third metal detector.

91.     The CO did not give Plaintiff A.R. the opportunity to walk back through the metal detector alone.

92.     Instead, the CO told Plaintiff A.R. that she was going to search her, which Plaintiff A.R. expected because she had submitted to searches before.

93.     However, instead of asking Plaintiff A.R. to pull up her pant legs, flip out her pockets, etc., the CO ordered Plaintiff A.R. to remove her shoes, remove her socks, and pull her pants down to her thighs, exposing Plaintiff A.R.'s underwear.

94.     The CO then pulled out the band of Plaintiff A.R.'s underwear with her finger and looked down her underwear from the front to view her genitals.

95.     The CO then kneeled behind Plaintiff A.R. and swept her hand from the front to the back of Plaintiff A.R.'s crotch while pulling Plaintiff A.R.'s underwear aside.

96.     The CO then asked Plaintiff A.R. to remove her brassiere and expose her breasts.

97.     Plaintiff A.R. was then told to dress and she proceeded to the visiting area.

98.     Defendant Mayweather was present throughout and directly observed Plaintiff A.R.'s illegal search and did nothing to intervene or otherwise stop the illegal conduct.

99.     There was absolutely no reasonable suspicion and/or probable cause to believe that Plaintiff A.R. was concealing a weapon or other contraband.

100.    After the visit, Plaintiff A.R. overheard the CO who searched her say, "they can't say that we didn't go hard in this bitch today."

101.    As a direct and proximate result of the unlawful search conducted pursuant to Defendants' policy, practice, and/or custom, and/or failure to adequately train and/or supervise, Plaintiff A.R. has suffered and continues to suffer psychological pain and mental anguish.

*Plaintiff D.M.'s Experience*

102.    Plaintiff D.M.'s experience is also representative of the experience of the putative class.

103.    Plaintiff D.M. visited the Brooklyn House of Detention on December 19, 2015.

104.    Plaintiff D.M. passed through two metal detectors without incident.

105.    Nonetheless, Defendant Graham had Plaintiff D.M. undergo a further search.

106.    Defendant Graham repeatedly asked Plaintiff D.M. whether she was carrying drugs.

107.    Plaintiff D.M. repeatedly told Defendant Graham that she was not carrying drugs.

108.    Defendant Graham put on gloves.

109.    Defendant Graham ran her hand over Plaintiff D.M.'s vagina over her pants so invasively that Defendant Graham detected Plaintiff D.M.'s tampon.

110.    Defendant Graham threatened to have Plaintiff D.M. arrested if she did not confess to secreting drugs.

111.    Plaintiff D.M. offered to go into the bathroom to remove her tampon in order to demonstrate to Defendant Graham that she was not secreting drugs.

112.    Plaintiff D.M. also asked to leave the premises.  Defendant Graham told Plaintiff

D.M. that she was not free to leave.

113.    Defendant Graham instructed Plaintiff D.M. to pull her underwear to the side to

expose the string of her tampon.

114.    Defendant Graham then ordered Plaintiff D.M. to partially pull out her tampon for

inspection.  Plaintiff D.M. complied with Defendant Graham's order.

115.    Plaintiff D.M. was then allowed to dress and proceed with her visit.

116.    There was absolutely no reasonable suspicion and/or probable cause to believe

that Plaintiff D.M. was concealing drugs or any other contraband.

117.    As a direct and proximate result of the unlawful search conducted pursuant to

Defendants' policy, practice, and/or custom, and/or failure to train and/or supervise,

Plaintiff A.R. has suffered and continues to suffer psychological pain and mental anguish.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Claims Pursuant to 42 U.S.C. § 1983 for**
**Violation of the Fourth and Fourteenth Amendment**
**to the United States Constitution)**

118.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

119.    The violations of Plaintiffs' and the class' constitutional rights, Plaintiffs' and the

class' damages, and the conduct of the individual Defendants were directly and

proximately caused by the actions and/or inactions of Defendant City, which has

encouraged, tolerated, ratified, and/or has been deliberately indifferent to the above

mentioned patterns and practices, and/or has been deliberately indifferent to the need for

more or different training, supervision, investigation, and/or discipline in the area of

searching visitors and/or insuring that visitors to DOC facilities are searched within the

law.

120.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and/or custom pursuant to which Plaintiffs and the class were or will be strip and/or body cavity searched without the requisite particularized reasonable suspicion and/or probable cause, and/or by failing to adequately train, investigate, discipline, and/or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with their employees because the need to act is so obvious and the inadequacy of current practices is so likely to result in a deprivation of federal rights, Defendants have deprived and will continue to deprive each and every Plaintiff and member of the class of rights, remedies, privileges, and immunities guaranteed by the Fourth and Fourteenth Amendment to the United States Constitution—including the right to bodily integrity and the right against unreasonable searches—conspired among themselves to do so (taking numerous overt steps in furtherance thereof), and failed to prevent one another from doing so.

121.    Defendants acted under pretense and color of state law in their individual and official capacities and within the scope of their employment.  Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs and the class of their rights secured by the Fourth and Fourteenth Amendment to the United States Constitution.

122.    As a direct and proximate result of the misconduct and abuse of authority detailed above, each and every Plaintiff and class member has suffered and continues to suffer psychological pain and mental anguish.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Claims Pursuant to the New York State Constitution, Article 1, § 12)**

123.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

124.    By implementing, promulgating, and continuing to enforce and effectuate a policy, practice, and/or custom pursuant to which the named Plaintiffs and other members of the class were or will be strip and/or body cavity searched without the requisite particularized reasonable suspicion and/or probable cause, and/or by failing to adequately train, investigate, discipline, and/or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with their employees because the need to act is so obvious and the inadequacy of current practices is so likely to result in a deprivation of rights, Defendants have deprived and will continue to deprive each and every Plaintiff and member of the class of rights, remedies, privileges, and immunities guaranteed by the New York State Constitution, Article 1, § 12.

125.    As a direct and proximate result of the misconduct and abuse of authority detailed above, each and every Plaintiff and member of the class has suffered and continues to suffer psychological pain and mental anguish.

## IRREPARABLE HARM

126.    If Defendants' policy, practice, and/or custom of conducting strip and/or body cavity searches without particularized reasonable suspicion and/or probable cause is not enjoined, and/or if Defendants' failure to provide adequate training and/or supervision to subordinates is not enjoined, Plaintiff Grottano, Plaintiff N.D., Plaintiff D.M., and class members may be subject to immediate and irreparable injury for which no adequate remedy at law exists because they are likely to suffer continued violations of their rights under the Fourth and Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

127.   WHEREFORE, Plaintiffs ask this Court

  a.   To enter an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and b(2) and b(3) for the class as described herein and naming Plaintiffs herein as the class representatives.

  b.   To enter a judgment declaring unconstitutional Defendants' policy, practice, and/or custom of strip and/or body cavity searching visitors to DOC facilities even in the absence of particularized reasonable suspicion and/or probable cause that such person is concealing contraband.

  c.   To enter a judgment declaring unconstitutional Defendants' failure to provide adequate training and/or supervision to subordinates.

  d.   To issue an order enjoining Defendants from implementing or enforcing the aforesaid unconstitutional policy, practice, and/or custom, and/or enjoining Defendants to provide adequate training and/or supervision to subordinates.

  e.   To award Plaintiffs and members of the class compensatory damages in an amount to be determined at trial, plus prejudgment interest.

  f.   To award Plaintiffs and members of the class punitive damages against all Defendants in their individual capacities except for the City of New York, in an amount to be determined at trial, plus prejudgment interest.

  g.   To award Plaintiffs and members of the class reasonable attorneys' fees and costs under 42 U.S.C. §§ 1988 and 1920.

  h.   To grant such other and further relief to Plaintiffs and members of the class as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated

herein.

Dated:  New York, New York
        February 24, 2016

GISKAN SOLOTAROFF & ANDERSON LLP


BY:                /s/Raymond Audain
                Raymond Audain
                Oren Giskan
                Aliaksandra Ramanenka
                11 Broadway, Suite 2150
                New York, NY 10004
                (646) 336-4904
                raudain@gslawny.com

BERANBAUM MENKEN LLP

                Bruce E. Menken
                Scott Simpson
                80 Pine Street, 33rd Floor
                New York, New York 10005
                (212) 509-1616
                (212) 509-8088
                bmenken@nyemployeelaw.com