**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

DANA GROTTANO, N.D., and D.M.,       :
individually and on behalf of all others similarly  :
situated,                                           :
                                                      :
                         Plaintiffs,      :
                                           :           15-CV-9242 (RMB)
             - against -            :
                                           :       **DECISION & ORDER**

THE CITY OF NEW YORK, THE CITY OF    :
NEW YORK DEPARTMENT OF CORRECTION  :
COMMISSIONER JOSEPH PONTE,        :
CORRECTION OFFICER YOLANDA CAPERS,  :
CORRECTION OFFICER THOMASENA      :
GRAHAM and JOHN and JANE DOE       :
CORRECTION OFFICERS 1–25,         :
                                           :
                       Defendants.     :
------------------------------------------------------------------x

## I.    Overview

       This case involves an invidious and disturbing practice that was allegedly carried out for years in New York City jails, namely the invasive "strip/body cavity searches" of individuals visiting New York City Department of Correction ("DOC") facilities. (Third Am. Compl. ¶¶ 46–117.) On December 17, 2015, Named Plaintiffs Dana Grottano, "N.D.," and "A.R."—three of many persons who had been subjected to invasive searches while visiting correction facilities where a friend or loved one may have been housed—filed a First Amended Class Action Complaint against the City of New York; former DOC Commissioner Joseph Ponte; Correction Officer Yolanda Capers; Correction Officer Thomasena Graham; and "John and Jane Doe Correction Officers 1–25."[1] Plaintiffs seek both monetary and injunctive relief, including "an order enjoining Defendants from implementing or enforcing the aforesaid unconstitutional policy,

---

[1] "D.M." joined the case as a Named Plaintiff on February 24, 2016, when Plaintiffs filed a Second Amended Complaint. (Second Am. Compl. ¶ 31.)

practice and/or custom, and/or enjoining Defendants to provide adequate training and/or supervision to subordinates." (Third Am. Compl. ¶ 127.)

Plaintiffs are represented by attorneys Bruce Menken and Scott Simpson of the law firm Menken Simpson & Rozger LLP; Raymond Audain of the NAACP Legal Defense & Educational Fund, Inc.; and Oren Giskan of Giskan Solotaroff & Anderson LLP. Defendants are represented by attorneys Kimberly Joyce, Genevieve Nelson, Angharad Wilson, and Katherine Weall, all of whom are senior attorneys in the New York City Law Department.

From the outset of this years-long case, the Court urged the parties to reach agreement quickly with respect to agreed-to necessary changes to DOC search protocols and also to speed up the distribution of money damages to all Class Members. At the October 30, 2019 hearing—following the signing of the parties' June 20, 2019 Settlement Agreement which included an injunction against improper searches and established a $12.5 million Settlement Fund—the Court reiterated its concern that DOC had not fully put an end to invasive visitor searches:

> "I am not quite understanding why people are still being subjected to what has been determined to be an improper search of a visitor. . . . I have been urging you all to move this case along faster than it had been moving, [] because I think it's an invidious practice. Everybody seems to have agreed to that. . . . One would have thought that the practice would have changed by now . . . . [W]hy is it still going on? . . . Why doesn't the City just stop it today? . . ." (Oct. 30, 2019 Tr. at 14–16.)

Defendants did agree to implement injunctive relief and Defense counsel stated: "[DOC] ha[s] been diligently working on it [i.e., a revised directive governing DOC's visitor search practices] and creating new training that the plaintiffs were involved with helping create. . . . I will talk to the client about starting the process of rolling out the directive and training." (Oct. 30, 2019 Tr. at 14.) And, the Court is encouraged by Defense counsel's most recent update regarding the status of injunctive relief. At the October 28, 2021 "fairness" hearing, and in a letter dated November 17, 2021, Defense counsel advised the Court that "the City is fully compliant with the

injunctive relief . . . agreed to by the Parties and endorsed by the Court, in the [June 20, 2019

Settlement Agreement], . . . in the following ways":

- DOC "revised its policies and procedures concerning searches of visitors to [DOC] facilities. The new Directive #2007R-E, entitled Visit Procedures for Incarcerated Individuals, was promulgated on March 1, 2021." (Defs.' Nov. 17, 2021 Ltr. at 2 citing Stukes Decl.)

- "No [DOC] personnel is assigned to a visit post . . . unless they have received the training required by the [Settlement Agreement]." (Defs.' Nov. 17, 2021 Ltr. at 2 citing Stukes Decl.)

- DOC "updated its visitor pat-frisk consent form, which clearly explains to the visitor what they are consenting to if they agree to be pat-frisk searched." (Oct. 28, 2021 Tr. at 26.)

- Under DOC's revised policies and procedures, a person can still visit an inmate "even if they refuse [to consent to] the pat [search]." In these cases, the visitor will "have a no-contact visit," i.e., "there [would be] plexiglass or some sort of division between the visitor and the[] [inmate]." (Oct. 28, 2021 Tr. at 30.)

- DOC "revised its training materials regarding visitor searches," including its "Lesson Plan," "Learner Guide," "Instructor's Guide," and "Participant's Workbook." (Nov. 17, 2021 Ltr. at 2 citing Straker Decl.; Oct. 28, 2021 Tr. at 26.)

- DOC "was required to provide initial training and refresher training . . . . [DOC] provided initial training to 100% of the required [DOC] members, by June 15, 2021. . . . Refresher training is scheduled to begin in November 2021, with a scheduled completion date of March 2022." (Defs.' Nov. 17, 2021 Ltr. at 2–3 citing Straker Decl.)

- DOC "updated its visitor pat-frisk poster and those [posters] are prominently placed in all visit areas [in the jails], so that visitors know what to expect if they consent to a pat-frisk search." (Oct. 28, 2021 Tr. at 26.)

- "[A]s part of the Post-Settlement Oversight agreed to by the Parties . . . , Plaintiffs' Counsel is entitled to visit every DOC facility visit area twice. On October 15, 2021, [Defense counsel], along with . . . counsel for Plaintiffs, visited every DOC facility visit area on Rikers Island. . . . and visit[ed] the Vernon C. Bain Center, located in the Bronx, [on] November 17, 2021." (Defs.' Nov. 17, 2021 Ltr. at 3.)

- "Prior to assigning or re-assigning any DOC staff to a post that includes responsibility for searching visitors or supervising visitor searches, DOC determines whether complaints of improper searches or any other information suggests that the DOC staff member may be unfit to search visitors or supervise visitor searches. DOC does not assign or re-assign any staff member who . . . it determines may be unfit for an assignment involving visitor searches or the supervision of visitor searches." (Defs.' Nov. 17, 2021 Ltr. at 2 citing Stukes Decl.)

With respect to money damages, "[e]ach eligible claimant will receive a minimum of

$1,000, unless they are part of the sub-category of individuals who were found with contraband

during their visit to a DOC facility," in which case "they will [still] receive $500." (Stip. Modifying Settlement Agmt. ¶ 11.)

The significant injunctive relief and money damages described above follow six years of extensive discovery, motion practice, court hearings, and settlement negotiations. After nearly three years of voluminous discovery and months of vigorous settlement negotiations under the supervision of former SDNY Magistrate Judge James C. Francis IV, the parties entered into a Settlement Agreement, dated June 20, 2019. (Settlement Agmt.) That Settlement Agreement provided, among other things, that: the City would pay "up to $12,500,000.00 . . . in satisfaction of all claims of Class Members"; and "Class Members who timely submit a Claim Form and who are eligible for payment . . . will receive approximately $4,000." (Settlement Agmt. ¶¶ 11, 57.)

Beginning in or about December 2019, notices advising potential Class Members of the Settlement (hereafter the "Initial Claims Notice") were widely disseminated to "hundreds of thousands" of potentially eligible Class Members—including "the largest direct mailing and advertising campaign in Law Department class action history." (Baldwin Decl. ¶¶ 4–10; Jan. 5, 2021 Tr. at 8; Defs.' Feb. 5, 2020 Ltr. at 3.) Regrettably, the Initial Claims Notice did **not** require that claimants provide a "narrative description" of their searches, as opposed to requiring only that they provide "some very basic identifying information." (Jan. 5, 2021 Tr. at 28; June 21, 2019 Mot. Ex. 2.) This resulted in an unforeseen (high) number of claims, yielding a pro rata "payout to claimants [that would have been] a fraction of [the $4,000] that was expected" under the Settlement. (Pls.' Jan. 22, 2020 Ltr. at 1.) In total, "45,792 timely claims were filed during the claims period," which would have meant that the payout would have been approximately $273 per claimant, (Menken Decl. ¶ 25), an unacceptably low amount.

Between January 2020 and May 2020, the parties undertook to negotiate a "revised settlement structure that include[d] . . . a refined claims form, one that [was] better calibrated to

4

identify individuals who fit within the Class definition." (Pls.' Mar. 13, 2020 Ltr. at 1.) When the parties could not reach agreement, on May 29, 2020, they engaged a highly regarded and expert mediator, Harvard Law Professor William B. Rubenstein.[2] (Menken Decl. ¶ 28.) Professor Rubenstein advised the Court as follows: "In the [Initial Claims Notice], for better or for worse, [the parties] anticipated class members would receive $4,000. When you do the math, that means they anticipated there would be roughly 3,000 claimants. . . . What then happened is they sent [the Initial Claims Notice] to hundreds of thousands of people and received 40,000 claims, rather than 3,000 claims." And, "the [Initial Claims Notice] required very little of [the claimants]. . . . [this] raised concerns that there [would] be more [claims submitted] than there were invasive searches." (Nov. 9, 2020 Tr. at 18; Jan. 5, 2021 Tr. at 8.)

Professor Rubenstein together with the parties worked intensively on crafting a Supplemental Claims Notice that was more realistic. It was "to be mailed to [the approximately 40,000] individuals who timely filed the original claim form" and was more accurately targeted toward identifying valid claims. (Menken Decl. ¶ 29.) The Supplemental Claims Notice "allowed claimants to identify the date and location of the searches they experienced as well as provide a narrative description of those searches." (Menken Decl. ¶ 29.) Based upon a randomly selected sample of 500 individuals, Professor Rubenstein (accurately) projected that the revised claims

---

[2] Professor Rubenstein is "an expert in class action litigation issues." (Menken Decl. ¶ 28.) "[He] is the author, co-author, or editor of four books and more than a dozen scholarly articles, as well as dozens of shorter publications, most of which concern complex litigation." See William B. Rubenstein Bio, Harvard Law School, https://hls.harvard.edu/faculty/directory/10742/Rubenstein. "Since 2008, Professor Rubenstein has edited *Newberg on Class Actions*: he is the sole author of the 10-volume treatise's Fifth Edition and is in the process of writing the Sixth Edition." (Rubenstein Bio; Pls.' Br. at 13.) And, "[f]ederal courts have appointed Professor Rubenstein to provide his expertise on issues [including] class certification . . . and to serve as a mediator[] in complex class actions." (Rubenstein Bio; Pls.' Br. at 13.) Professor Rubenstein graduated from Yale College *magna cum laude*, and from Harvard Law School *magna cum laude*. (Rubenstein Bio.)

process would yield "about 10,000 or 11,000 claims" and that "approved claimants would receive approximately $1,149 [each]." (Jan. 5, 2021 Tr. at 9; Menken Decl. ¶ 31.)

At a Court hearing on January 5, 2021, Professor Rubenstein described the depth of his work: "[He] had [initially] agreed to provide eight (8) hours of pro bono mediation services to the parties" but ultimately spent 800 hours. (Jan. 5, 2021 Tr. at 33; Rubenstein Jan. 10, 2021 Ltr. at 1.) "[His] law student research assistants also contributed a similar (or even greater) quantity of pro bono hours on the case." (Rubenstein Jan. 10, 2021 Ltr. at 1.) See In re GSE Bonds Antitrust Litig., 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019) ("a mediator's involvement in settlement negotiations can help demonstrate [a class settlement's] fairness").

On May 16, 2021, the Supplemental Claims Notice was mailed to the 40,000 individuals who had submitted claims in response to the Initial Claims Notice. (Baldwin Decl. ¶ 17.) The Supplemental Claims Notice differed from the Initial Claims Notice in several important respects, including these: **(i)** it required that claimants "provide a narrative account of the[ir] search" (the Initial Claims Notice had no such requirement); and **(ii)** it guaranteed a minimum of $1,000 to each eligible Class Member (rather than projected awards averaging $4,000).[3] (Jan. 5, 2021 Tr. at 9; Apr. 23, 2021 Order Ex. A.) In response to the Supplemental Claims Notice, approximately 12,500 claims were submitted and are projected to yield approximately $1,149 per Class Member. (Oct. 28, 2021 Tr. at 18–19.) Of those 12,500 claims, the Claims Administrator received only eight (8) requests for exclusion from the Settlement. **No objections were submitted.** (Baldwin Decl. ¶ 19.) By contrast, in response to the Initial Claims Notice, the Claims Administrator received 70 requests for exclusion from the Settlement and no objections. (Baldwin Decl. ¶¶ 13–14.)

---

[3] During intensive mediation with Magistrate Judge Francis, the City agreed to "a guaranteed floor of $1,000" for all eligible Class Members. (Menken Decl. ¶¶ 31–32.)

II.     **Plaintiffs' Unopposed Motion for Final Approval of Class Settlement & Certification of Settlement Class**

Federal Rule of Civil Procedure 23(e) requires court approval for a class action settlement to ensure that it is procedurally and substantively fair, reasonable, and adequate. Morris v. Affinity Health Plan, Inc., 859 F. Supp. 2d 611, 617–18 (S.D.N.Y. 2012) (citing Fed. R. Civ. P. 23(e)). To determine procedural fairness, courts examine, among other things, the negotiating process leading to the settlement. Id. at 618 (citing Wal–Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005)). "A class settlement is presumptively [procedurally] fair . . . if it is the result of 'arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" Melito v. Am. Eagle Outfitters, Inc., 2017 WL 3995619, at *11 (S.D.N.Y. Sept. 11, 2017) (quoting Wal-Mart, 396 F.3d at 117).

To determine substantive fairness, courts examine whether the settlement terms are fair, reasonable, and adequate according to the factors set forth in City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974). See Morris, 859 F. Supp. 2d at 618. "The Grinnell factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." Id. at 619 (citing Grinnell, 495 F.2d at 463).

**Procedural Fairness**

The Court finds that the parties conducted meaningful, extensive discovery and engaged in intensive arms-length negotiations. Over the course of nearly three years of (pre-settlement) litigation, the parties conducted numerous depositions of current and former City employees, the

7

Class Representatives, and several third-party witnesses; and produced "thousands of documents requested by Plaintiffs" which included "directives, memoranda, investigation files, pat-frisk consent forms, visitor search complaints, and emails." (Menken Decl. ¶¶ 9, 11.) Plaintiffs and Defendants also participated in many "meet and confers" among counsel and with this Court, and also with, among others, Magistrate Judge Kevin Nathaniel Fox. See Melito, 2017 WL 3995619, at *11.

The parties also engaged in "contentious and adversarial settlement negotiations" beginning in July 2018. (June 20, 2019 Tr. at 3; Menken Decl. ¶ 18.) In January 2019—after months spent in vigorous disagreement and unable to reach a settlement—the parties retained former SDNY Magistrate Judge James C. Francis IV. (Menken Decl. ¶ 19.) "Judge Francis presided over numerous in-person mediation sessions, many of which were day-long" and "worked closely with [the parties] to overcome key points of contention and broke several logjams that occurred during negotiations." (Menken Decl. ¶ 20.) These negotiations "include[d] at least eight in-person mediation sessions with Judge Francis, and countless email[s] and phone calls." (Defs.' Feb. 5, 2020 Ltr. at 2.) The parties ultimately entered into a Settlement Agreement, dated June 20, 2019. (Settlement Agmt.) As previously noted, that Settlement Agreement provided, among other things, for injunctive relief and monetary damages: the City agreed to overhaul its search protocols and to pay "up to $12,500,000.00 . . . in satisfaction of all claims of Class Members." (Settlement Agmt. ¶ 11.) "Class Members who timely submit a Claim Form and who are eligible for payment . . . [would] [according to the June 20, 2019 Settlement Agreement] receive approximately $4,000." (Settlement Agmt. ¶ 57.) The June 20, 2019 Settlement Agreement was subsequently modified and superseded by the April 22, 2021 Stipulation Modifying the Settlement Agreement, after it became clear that $4,000 per claimant was not attainable. See discussion at pp. 4–6 supra.

Throughout the settlement negotiations, the Settlement Class was represented by competent counsel with experience litigating and settling class actions, including the NAACP Legal Defense and Educational Fund, Inc., Menken Simpson & Rozger LLP, and Giskan Solotaroff & Anderson LLP. See Melito, 2017 WL 3995619, at *11 ("[T]he settlement is the product of arm's-length negotiations between competent counsel with experience in litigating and settling class actions . . . . Under such circumstances, the Court finds that the settlement is procedurally fair.").

Named Plaintiffs were very much involved in all phases of the litigation and the settlement negotiations. Named Plaintiffs approved the revised Settlement reached by the parties. See McBean v. City of New York, 233 F.R.D. 377, 383 (S.D.N.Y. 2006) ("[I]t is important to the integrity of the settlement that those individual named plaintiffs who approved the settlement were actually involved in its negotiation.").

The Court finds that the Class Settlement is procedurally fair. See In re Marsh ERISA Litig., 265 F.R.D. 128, 141 (S.D.N.Y. 2010) ("Where, as here, 'the settlement is the result of arm's length negotiations conducted by experienced counsel after adequate discovery and the settlement provokes only minimal objections,' [and] . . . the negotiations were conducted with the assistance of [] highly regarded mediator[s] . . . . the Court has no reason to doubt that the Settlement is procedurally fair." (citation omitted)).

**Substantive Fairness**

As noted, the Court examines the Grinnell factors in determining the substantive fairness of a class action settlement. See Morris, 859 F. Supp. 2d at 618 (citing Grinnell, 495 F.2d at 463). The first Grinnell factor is the complexity, expense, and likely duration of the litigation. Grinnell, 495 F.2d at 463. Most class actions are inherently complex and, as discussed above, this case has had a significant twist and turn regarding the initial proposed payout to Class Members. See

9

discussion at pp. 4–6 supra; see also In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000). Indeed, the Grottano case has been prolonged and somewhat unique. And, if the parties were to go to trial, they would likely need to engage in more motion practice and trial preparation. Any judgment following trial could be appealed, further delaying finality and substantially increasing the costs of litigation. By reaching a favorable settlement with the able assistance of Harvard Law School Professor Willliam B. Rubenstein and former Magistrate Judge Francis, the parties avoided even more significant expense and delay. See Hicks v. Morgan Stanley & Co., 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) ("Further litigation would necessarily involve further costs; justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action."). The Court finds that this first Grinnell factor weighs in favor of approving the Settlement.

The second Grinnell factor is "the reaction of the class to the settlement." Grinnell, 495 F.2d at 463. "It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." Tiro v. Pub. House Invs., LLC, 2013 WL 4830949, at *7 (S.D.N.Y. Sept. 10, 2013) (citation omitted). "Where relatively few class members opt-out of or object to the settlement, the lack of opposition supports court approval of the settlement." Id. In response to the Initial Claims Notice, as described at pp. 4–5 supra, some 40,000 individuals sought to join the Class. (Baldwin Decl. ¶ 15.) Of these approximately 40,000 individuals, **none** objected and 70 opted out. (Baldwin Decl. ¶¶ 13–14.) And, in response to the Supplemental Claims Notice which was sent to the same approximately 40,000 individuals who had earlier submitted claims, approximately 12,500 individuals timely applied to join the Class, **none** objected, and only 8 opted out. (Baldwin Decl. ¶ 19; Oct. 28, 2021 Tr. at 18.) This Grinnell factor weighs in favor of approving the Settlement. See Wright v. Stern, 553 F. Supp. 2d 337, 345 (S.D.N.Y. 2008) ("The fact that the vast majority of class members neither objected nor opted out

is a strong indication that the proposed settlement is fair, reasonable, and adequate."); see also In re Am. Bank Note Holographics, Inc., 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) ("[T]he lack of objections may well evidence the fairness of the Settlement.").

The third Grinnell factor is the stage of the proceedings and the amount of discovery completed. Grinnell, 495 F.2d at 463. "The stage of the proceedings and the amount of discovery completed are important facts to consider in order to ensure that plaintiffs have had access to material to evaluate their case and assess the adequacy of any settlement proposal." In re Med. X-Ray Film Antitrust Litig., 1998 WL 661515, at *4 (E.D.N.Y. Aug. 7, 1998). The parties here reached a final settlement on April 22, 2021 following years of investigation, discovery, negotiating, and drafting and, perhaps most importantly, including both the Initial Claims Notice as well as the Supplemental Claims Notice which was revised accurately, equitably, and with the help of Professor Rubenstein, to reach a fair monetary payout. "It is therefore apparent that Class Counsel 'has had sufficient information to act intelligently on behalf of the class.'" In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 126 (S.D.N.Y.), aff'd, 117 F.3d 721 (2d Cir. 1997) (citation omitted); see also In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 745 (S.D.N.Y. 1985), aff'd, 798 F.2d 35 (2d Cir. 1986) ("the parties certainly have a clear view of the strengths and weaknesses of their cases"). This factor weighs in favor of approval of the Settlement.

The fourth and fifth Grinnell factors are "the risks of establishing liability" and "the risks of establishing damages." Grinnell, 495 F.2d at 463. Plaintiffs acknowledge that they faced significant legal and procedural obstacles in establishing liability and damages in this civil rights action. (Pls.' Br. at 18.) Continued litigation would likely result in even more costly and lengthy proceedings before this Court (and perhaps on appeal). This would further significantly delay the awarding of any monetary relief. Establishing damages has already shown to be challenging and

"[e]ven after a lengthy trial, a jury could decide to award low or nominal damages." (Pls.' Br. at 18.) Indeed, it has been said that "putting a value on the violation of one's constitutional rights is 'necessarily an arbitrary and unprovable' endeavor." Stinson v. City of New York, 256 F. Supp. 3d 283, 294 (S.D.N.Y. 2017) (alterations omitted) (quoting Raysor v. Port Auth., 768 F.2d 34, 39 (2d Cir. 1985)). These factors weigh in favor of approval of the Settlement.

The sixth Grinnell factor is "the risk of maintaining the class action through trial." Grinnell, 495 F.2d at 463. Although the Court has certified the Class for settlement purposes, it is not a certainty that the Class would continue to hold together and be certified for trial. The risk that trial certification might be challenged or denied weighs in favor of approving the Settlement. See Gilliam v. Addicts Rehab. Ctr. Fund, 2008 WL 782596, at *4 (S.D.N.Y. Mar. 24, 2008) ("Although the Court has deemed the class certifiable for settlement purposes, it is not certain that the class would be certified in the absence of settlement. Defendants may challenge certification and prevail.").

The seventh Grinnell factor is "[t]he ability of the defendant to pay a judgment greater than the amount offered in a settlement." In re PaineWebber Ltd., 171 F.R.D. at 129. Where, as here, the defendant is the New York City government, obviously "the City has the ability to withstand a greater judgment." Stinson, 256 F. Supp. 3d at 294 (citation omitted); see also, e.g., Wright, 553 F. Supp. 2d at 347. "However, 'a defendant is not required to empty its coffers before a settlement can be found adequate.'" Stinson, 256 F. Supp. 3d at 294 (quoting In re IMAX Sec. Litig., 283 F.R.D. 178, 191 (S.D.N.Y. 2012)). Other courts have found that this Grinnell factor is often "neutral" with regard to approval of the settlement. Id.

The eighth and ninth Grinnell factors are "the range of reasonableness of the settlement fund in light of the best possible recovery," and "the range of reasonableness of the settlement fund . . . in light of all the attendant risks of litigation." Grinnell, 495 F.2d at 463. "The adequacy

of the amount achieved in settlement may not be judged 'in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.'" In re Giant Interactive Grp., Inc. Sec. Litig., 279 F.R.D. 151, 162 (S.D.N.Y. 2011) (citation omitted). The monetary relief per claimant as reflected in the Settlement is targeted and significant, even if less than originally estimated. The Settlement ensures both that the rights of visitors to NYC correctional facilities will be better protected going forward via strong injunctive relief, and it also ensures that each Class Member will receive a meaningful share of the $12.5 million Settlement Fund (and a minimum of $1,000). The Settlement falls within the bounds of reasonableness, and these two Grinnell factors weigh in favor of Settlement approval. See In re Veeco Instruments Inc. Sec. Litig., 2007 WL 4115809, at *11 (S.D.N.Y. Nov. 7, 2007) ("in light of the risks facing Plaintiffs, the unpredictability of a lengthy and complex trial, the inevitable appellate process that would follow, [and] the risk of reversal, . . . [the] Settlement falls squarely within the 'range of reasonableness.'" (citation omitted)).

For the above reasons, the Court finds that the Settlement meets the Grinnell factors and is substantively fair.

**Class Certification**

On October 30, 2019, the Court  ordered preliminary certification of the Class for settlement purposes. (Prelim. Approval Order.)

Pursuant to Federal Rule of Civil Procedure 23(a), "plaintiffs must satisfy each of four prerequisites in order to secure [final] class certification: numerosity, commonality, typicality, and adequacy of representation." Varljen v. H.J. Meyers & Co., 2000 WL 1683656, at *2 (S.D.N.Y. Nov. 8, 2000). "In addition to finding that the class satisfies Rule 23(a), the Court must also determine whether the class meets the requirements of Rule 23(b)." In re GSE Bonds Antitrust Litig., 414 F. Supp. 3d at 701. Under Rule 23(b)(3), certification is proper "if both (1) 'questions

of law or fact common to class members predominate over any questions affecting only individual members,' and (2) 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) (quoting Fed. R. Civ. P. 23(b)(3)).

With respect to the numerosity requirement under Rule 23(a), it would be "impracticable" to join the approximately 12,500-plus potential Class Members. See, e.g., Varljen, 2000 WL 1683656, at *2; see also, e.g., In re GSE Bonds Antitrust Litig., 414 F. Supp. at 700. Plaintiffs also allege questions of law and fact that are common to the Class, including whether Defendants subjected visitors such as Plaintiffs to invasive searches. Varljen, 2000 WL 1683656, at *2. As to typicality, Plaintiffs' visitor claims stem from similar events and rely on similar legal arguments. Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality and typicality requirements tend to merge into one another . . . ."). And, Class Counsel are adequate, i.e., "qualified, experienced, and generally able to conduct the litigation." Id. at 378 (citation omitted).

The Court also finds that Federal Rule of Civil Procedure 23(b)(3) is satisfied because "questions of law or fact common to class members predominate over any questions affecting only individual members, and [because] . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In re GSE Bonds Antitrust Litig., 414 F. Supp. 3d at 701 (quoting Fed. R. Civ. P. 23(b)(3)). As courts have found in other invasive search cases, "the central issue of the constitutionality of [a correctional facility's] policy predominates over any factual or legal variations among class members," and "a class action is superior where, as here, potential class members are aggrieved by the same policies, and the damages suffered are [relatively] small relative to the expense and burden of individual litigation." Parker v. City of New York, 2017 WL 6375736, at *11 (E.D.N.Y. Dec. 11, 2017) (alterations and citation omitted); see also In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 228 (2d Cir. 2006) ("[W]hen plaintiffs

'are allegedly aggrieved by a single policy of defendants,' . . . the case presents 'precisely the type of situation for which the class action device is suited' since many nearly identical litigations can be adjudicated in unison." (citation omitted)).

The Court finds that the Settlement Class clearly satisfies Federal Rule of Civil Procedure 23.

**<u>Incentive Awards</u>**

Plaintiffs have filed a motion, dated August 13, 2021, seeking $70,000 in incentive awards for the Named Plaintiffs. Plaintiffs request $30,000 for Dana Grottano; $20,000 for "N.D."; and $20,000 for "D.M." (Pls.' Br. at 9.) These awards are unopposed. Indeed, the City agreed to pay $70,000 in incentive awards pursuant to the terms of the Settlement Agreement, and these "incentive award payments shall be in addition to [the $12.5 million Settlement Fund]." (Settlement Agmt. ¶ 55.)

Plaintiffs contend that the incentive awards are reasonable because "[t]he Named Plaintiffs endured horrific experiences while visiting a loved one at a City jail, and they risked retaliation by [correctional officers] during subsequent visits to DOC facilities." (Pls.' Br. at 25.) Counsel states that the Named Plaintiffs "were actively engaged in every phase of this case" and "played a critical role" throughout litigation and settlement negotiations. (Pls.' Br. at 25.) "Each Named Plaintiff repeatedly recounted their terrible invasive search experiences to Plaintiffs' counsel and, eventually, on the record in their respective depositions. Each Named Plaintiff also met with counsel many times to gather [the] facts [] allege[d] in the Complaint, to respond to discovery requests, and to prepare and sit for their depositions. . . . Each Named Plaintiff [also] attended, in person, a portion of one of the mediation sessions." (Menken Decl. ¶¶ 16–17.)

"Courts often consider the following factors in assessing incentive awards: 'the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time

and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), [and] any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim.'" Melito, 2017 WL 3995619, at *16 (citation omitted).

**The Court finds that these and other factors weigh strongly in favor of approving the incentive awards.** "[W]ithout these class representatives—who have prosecuted this case for almost six years—there would be no settlement fund or injunctive relief." (Pls.' Br. at 25; emphasis in original.) "The Named Plaintiffs relived traumatic moments and testified to embarrassing and humiliating personal experiences. . . . [They] have repeatedly demonstrated their commitment to the class. Each met with counsel many times . . . . The Named Plaintiffs also played a critical role during the Parties' lengthy [settlement] negotiations by attending a portion of one of the mediation sessions with Judge Francis and helped to develop effective injunctive relief." (Pls.' Br. at 25.)

The requested incentive awards proposed in this case are especially important. They are also at least comparable to what other courts in this District have deemed appropriate. "Such service awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." Torres v. Gristede's Operating Corp., 2010 WL 5507892, at *7 (S.D.N.Y. Dec. 21, 2010), aff'd, 519 F. App'x 1 (2d Cir. 2013). In McBean v. City of New York, 233 F.R.D. 377 (S.D.N.Y. 2006)—a case involving a settlement class of pre-trial detainees who "were subjected to unconstitutional strip searches . . . in DOC jails"—the court approved incentive awards for class representatives in the amounts of $25,000, $30,000, and $35,000, respectively, and noted that these awards "appear[] to be in line with the amount of damages awarded in high-value strip-search claims." Id. at 380, 385, 391; see, e.g., Haas v. Burlington Cty., 2019 WL 413530, at *3, 10–11 (D.N.J. Jan. 31, 2019)

("The Settlement Agreement directs that . . . Plaintiff Szczpaniak [is] to receive $30,000 [] as an incentive award. . . . this Court finds reasonable the incentive award[] . . . . [Plaintiff's] role in this [strip-search] case required responding to discovery requests, being deposed, appearing in court, and participating in settlement discussions. . . . **Without an incentive award, putative class representatives may be discouraged to come forward in cases involving alleged violations of constitutional rights that open them to public judgment of private facts."** (emphasis added)); Miracle v. Bullitt Cty., Ky., 2008 WL 4974799, at *1–2 (W.D. Ky. Nov. 19, 2008) ("In this [strip-search] case, . . . named class representatives, depending upon their length in service, will receive between $10,000 and $30,000 each. . . . The named class representatives participated in two mediations of this case, numerous meetings with counsel and periodic contact via telephone. They have honorably discharged their responsibilities as named class representatives[.]"); Boone v. City of Philadelphia, 668 F. Supp. 2d 693, 715 (E.D. Pa. 2009) ("Class counsel requests a special award of $15,000 for each class representative. Other strip-search settlements provide similar awards to class representatives."); see also, e.g., Stinson, 256 F. Supp. 3d at 295; Yap v. Sumitomo Corp. of Am., 1991 WL 29112, at *4, *9 (S.D.N.Y. Feb. 22, 1991).

And, **"[t]he Court notes with approval that [Defendant] has agreed to pay these incentive awards directly, and therefore the awards will not diminish the recovery of any other class members."** Dupler v. Costco Wholesale Corp., 705 F. Supp. 2d 231, 246 (E.D.N.Y. 2010) (emphasis added) ("The Court [] finds that the incentive award[] of $25,000 to [Plaintiff] . . . [is] reasonable, especially in light of the fact that [it] do[es] not come out of a common fund.").

III.   **Conclusion & Order**

**For the foregoing reasons, the Court grants Plaintiffs' Motion for Final Approval of the Class Settlement and for Final Certification of the Settlement Class [Dkt. # 332]. The Court also grants Plaintiffs' application for $70,000 in incentive payments to be awarded to the three**

**Named Plaintiffs [Dkt. # 333 at pp. 25–28] and directs that the parties consummate (deliver)**

**the Incentive Awards forthwith, and in no event later than Thursday, December 9, 2021.**

Dated:  New York, New York
        November 29, 2021

_____
**RICHARD M. BERMAN**
**U.S.D.J.**